J-A09044-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: D.C., A MINOR | : | |
| | : | No. 1059 WDA 2023 |

Appeal from the Order Entered August 11, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000007-2023

BEFORE:  DUBOW, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                           **FILED: July 1, 2024**

D.C. (Child), born in January 2021, appeals[1] from the August 11, 2023 order denying the petition filed by the Allegheny County Office of Children, Youth and Families (CYF) to involuntarily terminate the parental rights of C.C. (Mother) to Child.  Upon careful review, we affirm.

Briefly, CYF first became involved with this family in December 2012, approximately eight years before Child's birth.[2]  **See** N.T., 8/3/23, at 9.  Over

---

[1] By separate decree, entered on the same date, the orphans' court terminated the parental rights of any unknown father with respect to Child.  No purported father has filed an appeal from the decree terminating his parental rights.

[2] Child has four older siblings born in July 2009, March 2011, September 2014, and March 2018, respectively.  **See** N.T., 8/4/23, at 9.  Following an initial report in December 2012, CYF received another referral in March 2013 and removed Child's two oldest siblings from Mother's care.  **See id.** at 12.  Child's two oldest siblings were placed in their father's care, and there is nothing in
*(Footnote Continued Next Page)*

the course of several years, CYF received approximately twenty-two referrals regarding Mother's family. *See id.* at 14. On November 23, 2020, CYF received a referral that Child's siblings, who remained in Mother's care, had injuries consistent with physical abuse and that Mother was struggling with her mental health.[3] *See id.* at 17, 20. Additionally, CYF removed Child from Mother's care shortly after her birth in January 2021. *See id.* at 20. Child was returned to Mother on February 3, 2021, after the juvenile court dismissed CYF's petition for dependency. *See id.* at 20-21.

On May 20, 2021, Child was again removed from Mother's care after CYF received another report of physical injuries sustained by one of Child's siblings. *See id.* at 21. Child was placed in a pre-adoptive kinship foster home, where she has remained throughout the underlying dependency matter.[4] *See id.* at 21, 23. The juvenile court adjudicated Child dependent on August 11, 2021. In furtherance of Child's permanency goal of reunification, the juvenile court ordered Mother to achieve the following goals: (1) participate in mental health treatment, including, *inter alia*, medication

---

the record indicating that these children have been returned to Mother's care. *See id.*

[3] As a result of this incident, Mother was convicted of endangering the welfare of children and simple assault of a child. *See* CYF Exhibit 1; *see also* N.T., 8/4/23, at 22, 181. Mother reported that she is engaged with "Mental Health Court." *See* N.T., 8/4/23, at 153, 186-87, 195.

[4] Child's next two oldest siblings were placed with their respective fathers. *See* N.T., 8/4/23, at 21.

management as well as submit to a psychological evaluation; (2) attend visitation with Child; and (3) complete a parenting class. *See id.* at 24; *see also* CYF Exhibit 2 (Order of Adjudication & Disposition, CP-02-DP-16-2021, 8/11/21, at 2).

On February 3, 2023, CYF filed a petition seeking the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). When the orphans' court conducted an evidentiary hearing on August 4, 2023, Child was approximately two-and-a-half years old.[5] At the hearing, CYF presented testimony from Mary Zorn and Heidi Hysong, CYF caseworkers; Kirk Thoma, a visitation specialist at Children's Institute; Genafie McKnight, LCSW, Mother's therapist; William Pipkins, a transportation supervisor at Second Chance;[6] and Patricia Pepe, Ph.D., a licensed psychologist who performed several psychological evaluations involving

---

[5] On March 30, 2023, the orphans' court appointed KidsVoice as Child's legal counsel. KidsVoice had also represented Child as her guardian *ad litem* ("GAL") in the dependency proceedings. Pursuant to this Court's order, the orphans' court filed a supplemental Pa.R.A.P. 1925(a) opinion clarifying that it determined no conflict existed between Child's legal and best interests. *See* Suppl. Orphans' Ct. Op., 4/25/24, at 11; *see also In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) (holding that "where an orphans' court has appointed a GAL/Counsel to represent both the child's best interests and legal interests, appellate courts should review *sua sponte* whether the orphans' court made a determination that those interests did not conflict").

[6] Second Chance provided transportation for Child to the visits at Mother's home and supervised some of those visits. *See* N.T., 8/4/23, at 110-11.

Mother, Child, and Foster Mother.[7]  Mother testified on her own behalf and presented the testimony of Kendra Kirkland, a visitation specialist at Children's Institute.

Ms. Zorn, a CYF caseworker, explained that shortly after the birth of Child, Mother began participating in therapy at the Staunton Clinic (Staunton). *See* N.T., 8/4/23, at 30.  Staunton referred Mother for dialectical behavioral therapy (DBT) and placed her on a waitlist.[8]  *Id.* at 30-31.  However, in October 2021, following the departure of her therapist at Staunton, Mother transferred to a new treatment provider, GSM Therapeutic and Consulting Services (GSM) and declined DBT.  *Id.* at 31-32.  Mother remained in therapy at GSM at the time of the termination proceeding.  *Id.* at 32.  However, Ms. Zorn was concerned that Mother stated that her mental health and medication management "wasn't an issue and she didn't understand why it continued to be a topic."  *Id.* at 34.  Mother completed various parenting classes during Child's dependency.  *See id.* at 37.  However, Ms. Zorn stated that there were concerns that Mother used excessive physical discipline because of an alleged incident in September 2021 in which Mother improperly disciplined and loudly yelled at Child's two older siblings, and that Mother told a caseworker that

_____

[7] Dr. Pepe's reports were admitted, without objection, as CYF Exhibit 4.  *See* N.T., 8/4/23, at 163-66.

[8] It is unclear from the certified record what DBT entails.

"physical discipline was something that happened in [Mother's] childhood, and she would continue to parent as she was going to parent." *See id.* at 38-40.

Mr. Thoma, Mr. Pipkins, and Ms. Kirkland all testified that Mother participated in supervised visitation with Child at Mother's home. *See id.* at 55-57, 114-17, 185-86. Other than visits that were cancelled because of factors outside Mother's control, Mother only missed visits because of her work schedule. *See id.* at 117, 186-87. Further, Mr. Thoma, a visitation specialist, testified that Mother reacted appropriately by taking away inappropriate objects that Child picked up without Mr. Thoma prompting Mother first. *See id.* at 72-73. While Mr. Thoma did not believe that Mother had made progress towards her parenting goals, he did not have concerns about Mother and Child. *See id.* at 76. Ms. Kirkland, another visitation specialist, stated that she had built a rapport with Mother and she did not have any concerns with Mother in regard to Child. *See id.* at 187-88.

Ms. McKnight, Mother's therapist, testified that she began working with Mother in October 2021. *See id.* at 80. She further stated that there was an eight-week lapse in treatment when Mother was going to Mercy Behavioral Health for a court-ordered psychiatric evaluation. *See id.* at 80-81. Following the psychiatric evaluation, Mother returned to therapy sessions with Ms. McKnight. *See id.* at 81. From May 2022 to October 2022, Ms. McKnight reported that Mother was doing "very well." *See id.* However, in October 2022, Mother reported that she obtained a new job and would reengage

therapy once she had her work schedule in order. *See id.* at 81-84. In March 2023, Mother had her first appointment since beginning her new job. *See id.*

Despite pauses in treatment, Ms. McKnight stated that she and Mother had "built a good therapeutic rapport[,]" Mother "has been receptive to the therapeutic intervention[,]" and Mother "has made progress with where she was to where she is now." *Id.* at 87-88. Ms. McKnight also explained that Mother acknowledged her responsibility for the removal of Child from her care. *See id.* at 89.

Ms. McKnight testified regarding Mother's decision not to take medication as follows:

> Q: You said [in your August 23, 2022 letter] that [Mother] is resistant to medication maintenance and doesn't wish to take prescribed psychotropic medications. Has medication maintenance been a recommendation for [Mother]?
>
> [Ms. McKnight]: Based off of the information I received from Mercy Behavioral Health, [Mother] was recommended it -- recommended to try out a medication at that time, and that's again around the time that she had a lapse in treatment with me. . . .
>
> Q: Okay. And since you've been working with her, has she had any updated psychiatric evaluations indicating that medication is not [sic] longer a recommendation for treatment of her mental health diagnoses?
>
> [Ms. McKnight]: No.
>
>        *   *   *
>
> Q: From the standpoint of your experience as a psychologist who has at different times been responsible for diagnosing clients and patients with different diagnoses including in this case bipolar, in your experience is medication usually a first line treatment for individuals with bipolar?

[Ms. McKnight]: Typically it's medication and therapy.

Q: . . . . So from the standpoint as a clinician, what are your thoughts with [Mother's] refusal to utilize recommended medication management?

\* \* \*

[Ms. McKnight]: . . . [W]hen it comes to medication, it doesn't appear that [a lack of medication] has limited [Mother] from making progress and being able to have self-control with not -- it's not [as if Mother] was coming to sessions and she was still getting arrested. [Or] she was still fighting at work or [having] outbursts. [Then] I would have been advocating [for medication]. Like I would have been recommending it more as her clinician, but I have not seen that.

She has been making consistent progress without the medication. . . . [B]ut with the complexity and everything going on with her, I hadn't seen the need to continue to push it on her because she's been making progress without it.

*Id.* at 89-92 (some formatting altered); *see also id.* at 98 (Ms. McKnight testified that Mother is engaged in mental health treatment at the recommended level).

Mother testified about her decision to not take medication as follows:

Q: [T]here was testimony that you didn't like the way [medication] made you feel. I just want to give you a chance to respond; is that accurate?

[Mother]: Yes.

\* \* \*

Q: Can the [c]ourt rely on you, though, in the future if you feel that you need some extra help maybe in medication, would you seek it out?

[Mother]: Yes.

*Id.* at 191-92.

Dr. Pepe performed at least two psychological evaluations of Mother and diagnosed her with an antisocial personality disorder. *See id.* at 168. Dr. Pepe opined that that Child's safety could not be "guaranteed" if Child was returned to Mother, but Dr. Pepe also acknowledged that Mother has expressed remorse, that Mother's "attitude had markedly improved" during her second psychological evaluation, "and she expressed wanting to be more cooperative." *Id.* at 169-71. Dr. Pepe further reported that Mother "expressed insight into her behavior, understanding [that] her behavior as a result of her children's removal from her care[.]" *Id.* at 176.

Mother explained that the coaching during her supervised visitation with Child was helpful to developing her relationship with Child. *See id.* at 194. Mother further testified that therapy has "help[ed] me think and react -- they had me think more about what I've been doing in the past. . . . I [have] overcome some of the struggles I had . . . with not opening up, not talking, not getting help, not getting the proper things I need to get done." *Id.* at 194. Mother also testified that she would not utilize any "physical discipline whatsoever[]" when caring for Child. *Id.* at 220.

By an amended order dated August 4, 2023, and entered August 11, 2023, the orphans' court denied CYF's petition to involuntarily terminate Mother's parental rights. Child timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed a Rule 1925(a) opinion on

December 19, 2023, and a supplemental opinion on April 25, 2024, that corrected an error regarding its rationale for denying the petition.

On appeal, Child presents the following issues for review:

1. Whether the [orphans'] court abused its discretion and/or erred as a matter of law in denying CYF's petition to involuntarily terminate the parental rights of Mother after CYF proved by clear and convincing evidence that grounds for termination existed pursuant to 23 Pa.C.S.[] § 2511(a)(8)?

2. Whether the [orphans'] court abused its discretion and/or erred as a matter of law in denying CYF's petition to involuntarily terminate the parental rights of Mother after CYF proved by clear and convincing evidence that termination serves the needs and welfare of Child pursuant to 23 Pa.C.S.[] § 2511(b)?

Child's Brief at 5.[9]

First, Child argues that the orphans' court abused its discretion by denying CYF's petition to terminate Mother's parental rights because CYF presented clear and convincing evidence to support termination under Section 2511(a)(8). *Id.* at 19-24. Specifically, Child claims that Mother has failed to comply with her goals for mental health treatment, such as medication management and engaging in DBT. *Id.* at 20. She further contends that

_____

[9] As noted above, CYF filed a petition to involuntarily terminate Mother's parental rights under 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). In both her Rule 1925(b) statement and her statement of questions involved in her brief, Child only argues that termination was appropriate under Section 2511(a)(8) and (b). Therefore, Child has waived any claims concerning Section 2511(a)(2) and (5). *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (stating that "it is well-settled that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived" (citation omitted)).

Mother was inconsistent in attending her individual therapy. *Id.* Child also notes that Dr. Pepe opined that Child's safety would be at risk if she was returned to Mother's custody because of Mother's mental health issues, which includes antisocial personality disorder. *Id.* at 20-21 (citing N.T., 8/4/23, at 168-69).

Child further argues that even after completing several parenting programs and participating in coached visitation, CYF continued to harbor concerns about Mother's parenting skills, specifically Mother's use of inappropriate physical discipline. *Id.* at 21-22. Child notes that Mother told Ms. Zorn that "physical discipline was something that happened in [Mother's] childhood, and [Mother] would continue to parent as she was going to parent." *Id.* at 22 (quoting N.T., 8/4/23, at 34, 39-40). Child also contends that termination was appropriate because of an incident in September 2021 where Mother used excessive physical discipline against one of Child's siblings, and this incident resulted in criminal charges being filed against Mother. *Id.* at 22. Child concludes that the record shows that the conditions which led to Child's removal from Mother's care continued to exist as of the date of the termination hearing. *Id.* 22-23.

CYF also argues that the orphans' court erred by denying its petition to involuntarily terminate Mother's parental rights because the record shows that "despite some progress, Mother had not been able to and would not be able to remedy the conditions causing Child's removal and that those conditions continue to exist." CYF's brief at 35.

Our standard of review in this context is well-settled:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re H.H.N.*, 296 A.3d 1258, 1263 (Pa. Super 2023) (citing *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)); *see also In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (explaining that "the trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence" (citation omitted)).

Termination of parental rights is governed by § 2511 of the Adoption Act[, 23 Pa.C.S. §§ 2101-2938]. Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination. In evaluating whether the petitioner proved grounds under § 2511(a), the trial court must focus on the parent's conduct and avoid using a balancing or best interest approach. If the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under § 2511(b), which focuses on the child's needs and welfare. [*T.S.M.*, 71 A.3d at 267].

*In re M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (some citations omitted and some formatting altered); *see also Q.R.D.*, 214 A.3d at 239 (explaining that if "the court determines the parent's conduct warrants termination of his or

- 11 -

her parental rights, the court then engages in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child" (citation omitted and formatting altered)).

Section 2511(a)(8) provides as follows:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

In order to satisfy Section 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least twelve months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Our inquiry is focused on whether "the conditions which **led** to the removal or placement . . . **continue** to exist." *In re R.R.D.*, 300 A.3d 1077, 1082 (Pa. Super. 2023) (citation omitted and emphases in original). The *R.R.D.* Court held that the trial court erred in terminating the parents' parental

rights under Section 2511(a)(8) because the trial court had determined that the conditions which led to removal of the children had been "resolved." ***Id.***

Here, the orphans' court explained:

Mother's continued compliance with her mental health treatment at the recommended level is an indication that she is making positive progress in the best interests of [Child]. Mother has also acknowledged her role in [in the removal of her children]. Mother was also able to make a substantial number of visits given her new employment work schedule. The court sees these efforts by Mother as remedying the conditions which led to removal and placement of [] Child. All of these efforts by Mother are seen by this court as being within a reasonable period of time and that best serve the needs and welfare of [] Child.

An examination under the factors in (a)(8) reveal that [] Child has been removed from Mother's care by the court for more than 12 months. Further, the conditions which led to [Child's] removal have been addressed by Mother. . . .

\* \* \*

The evidence in this case presented by the CYF petition to terminate Mother's parental rights is not clear and convincing and does not establish grounds for termination. It is not evident to this court that termination would best meet [] Child's needs and welfare.

Suppl. Orphans' Ct. Op., 4/25/24, at 10, 13 (some formatting altered).

Following our review, and bearing in mind our deferential standard of review, we discern no abuse of discretion in the orphans' court's findings. ***See H.H.N.***, 296 A.3d at 1263. The record supports the orphans' court's conclusion that Mother has remedied the conditions which led to the removal or placement of Child, namely Mother's mental health issues and her previous

use of inappropriate physical discipline. *See R.R.D.*, 300 A.3d at 1082; *J.N.M.*, 177 A.3d at 943.

Here, Mother's therapist, Ms. McKnight, testified that Mother has made substantial progress in addressing her mental health issues without medication and that Mother had acknowledged her responsibility for Child's removal from her care. *See* N.T., 8/4/23, at 89, 91-92.

Mother testified that she will no longer use physical discipline, has responded appropriately during supervised visitation with Child, and there have been no allegations that Mother has used inappropriate physical discipline on any of her Children since September 2021. *See id.* at 38-39, 72-73, 220. Further, Mother's visitation specialists, Mr. Thoma and Ms. Kirkland, reported that they had no concerns with Mother's interactions with Child. *See id.* at 76, 187-88.

Accordingly, on this record, we agree with the orphans' court and conclude that CYF has failed to establish by clear and convincing evidence that the conditions which led to Child's removal and placement still exist. *See R.R.D.*, 300 A.3d at 1082. We emphasize that this Court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *See H.H.N.*, 296 A.3d at 1263. For these reasons, we discern no abuse of discretion by the orphans' court in concluding that termination was not appropriate under Section 2511(a)(8). Therefore, Child is not entitled to relief on this claim.

Because we are affirming the orphans' court's conclusion that termination of Mother's parental rights was not appropriate under Section 2511(a)(8), we need not address Child's second issue regarding Section 2511(b). ***See M.E.***, 283 A.3d at 830; ***see also Q.R.D.***, 214 A.3d at 239.

Based on the foregoing, we affirm the order denying CYF's petition to involuntarily terminate Mother's parental rights.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 07/01/2024